1
2
3
4
5
6
7

UNITED STATES  DISTRICT COURT

Northern District of California

Oakland Division

JODY D. HULEN,

               Plaintiff,

   v.

MICHAEL J. ASTRUE, Commissioner of
Social Security,

               Defendant.

_____/

No. C 10-04663 LB

**ORDER GRANTING PLAINTIFF'S
MOTION FOR SUMMARY
JUDGMENT AND DENYING
DEFENDANT'S CROSS-MOTION
FOR SUMMARY JUDGMENT**

**[ECF Nos. 16 & 17]**

## I.  INTRODUCTION

Plaintiff Jody Hulen moves for summary judgment, seeking judicial review of a final decision by the Commissioner of Social Security denying her Social Security Income disability benefits for her claimed disability of lumbar degenerative disc disease and an adjustment disorder.  Motion for Summary Judgment, ECF No. 16;[1] Administrative Record (AR) at 19, 241-49.  The Administrative Law Judge (ALJ) determined that Ms. Hulen could not perform her past relevant work but could work in alternative jobs that exist in significant numbers in the national economy.  AR at 26-27.

Pursuant to Civil Local Rule 16-5, the matter is deemed submitted for decision without oral argument.  All parties have consented to the court's jurisdiction.  *See* ECF Nos. 5 & 9.  Because the Commissioner's decision is not supported by substantial evidence and Ms. Hulen is "disabled" as

---

[1] Citations are to the Electronic Case File ("ECF") with pin cites to the electronic page number at the top of the document, not the pages at the bottom.

defined by the Social Security Act, the court **GRANTS** Ms. Hulen's motion for summary judgment, **DENIES** the Commissioner's cross-motion for summary judgment, and **REMANDS** this case to the agency for a calculation of benefits.

## II. PROCEDURAL HISTORY

Ms. Hulen, now 47, applied for disability benefits on February 21, 2006 following her work-related injuries in 2004 and 2005. AR 198-203. At the time she was injured, she worked for a company called M2P2, which specialized in swine breeding, and she had worked as a hog breeder and animal caretaker for a number of years. AR 256-58. On May 25, 2004, a 400- to 500-pound sow pinned Ms. Hulen against a wall and knocked her to the ground while she was attempting to load the sow into a crate. AR 455. In March 2005, she was injured again when a sow chased her. AR 41, 455. She last worked on March 16, 2005. AR 242.

On February 21, 2006, Ms. Hulen applied for social security disability insurance benefits and supplemental security income. AR 198-203.[2] She alleged that she was unable to work since March 16, 2005 due primarily to degenerative disc disease and an adjustment disorder. AR 19.[3] The Commissioner denied her application initially on August 17, 2006 and on reconsideration on March 5, 2007. AR 82-83. Ms. Hulen timely requested a hearing before an ALJ on April 20, 2007. AR 127-129. After an administrative hearing in November 2008, an ALJ denied Ms. Hulen's application on April 21, 2009. AR 87-100.

On appeal, the Social Security Appeals Council overturned the decision and remanded the case for a new hearing to reevaluate the rejection of the treating source opinion and the finding that Ms. Hulen's statements concerning her disability were not credible. AR 102. Specifically, the Appeals Council directed the ALJ to (1) "obtain additional evidence concerning [Ms. Hulen's] orthopedic and mental impairments," (2) "further evaluate [Ms. Hulen's] subjective complaints," (3) "give

---

[2] Ms. Hulen's actual filing date was February 21, 2006, and her protective filing date was February 2, 2006. AR 82-83, 238-40; *see* 20 C.F.R. § 416.345 (a written or oral inquiry for benefits is treated as the filing date for the application of benefits).

[3] During the administrative proceedings before the ALJ, Ms. Hulen stipulated that her history of a broken ankle was not part of the disability evaluation. *See* AR 19.

UNITED STATES DISTRICT COURT
For the Northern District of California

1   further consideration to [Ms. Hulen's] maximum residual functional capacity," and (4) "if warranted

2   by the expanded record, obtain supplemental evidence from a vocational expert to clarify the effect

3   of the assessed limitations on [Ms. Hulen's] occupational base." AR 102-03.  On remand, a

4   different ALJ held a hearing on January 26, 2010.  AR 39-62.  The ALJ denied benefits on March 5,

5   2010, finding that Ms. Hulen was not disabled because there are jobs that exist in significant

6   numbers in the national economy that she could perform.  AR 28.  The Appeals Council denied Ms.

7   Hulen's request for review on August 17, 2010.  AR 1-5.  On October 15, 2010, Ms. Hulen timely

8   sought judicial review under 42 U.S.C. § 405(g).  Complaint, ECF No. 1.  Both sides move for

9   summary judgment.

10                                       **III.  LEGAL STANDARD**

11   **A.  <u>Standard of Review</u>**

12       Under 42 U.S.C. § 405(g), district courts have jurisdiction to review any final decision of the

13   Commissioner if the plaintiff initiates the suit within 60 days of the decision.  District courts may set

14   aside the Commissioner's denial of benefits only if the ALJ's  "findings are based on legal error or

15   are not supported by substantial evidence in the record as a whole."  42 U.S.C. § 405(g); *Vasquez v.*

16   *Astrue*, 572 F.3d 586, 591 (9th Cir. 2009) (quotation omitted). "Substantial evidence means more

17   than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind

18   might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir.

19   1995).  If the evidence in the administrative record supports both the ALJ's decision and a different

20   outcome, the court must defer to the ALJ's decision and may not substitute its own decision.  *See*

21   *id.*; *accord Tackett v. Apfel*, 180 F.3d 1094, 1097-98 (9th Cir. 1999).

22   **B.  <u>Applicable Law: Five Steps To Determine Disability</u>**

23       An SSI claimant is considered disabled if (1) he suffers from a "medically determinable physical

24   or mental impairment which can be expected to result in death or which has lasted or can be

25   expected to last for a continuous period of not less than twelve months," and (2) the "impairment or

26   impairments are of such severity that he is not only unable to do his previous work but cannot,

27   considering his age, education, and work experience, engage in any other kind of substantial gainful

28   work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A) & (B).

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

ORDER (C 10-04663 LB)

The Social Security regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act. *See* 20 C.F.R. § 404.1520. The five steps are as follows:

**Step One.** Is the claimant presently working in a substantially gainful activity? If so, then the claimant is "not disabled" and is not entitled to benefits. If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one, and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(a)(4)(i).

**Step Two.** Is the claimant's impairment (or combination of impairments) severe? If not, the claimant is not disabled. If so, the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

**Step Three.** Does the impairment "meet or equal" one of a list of specified impairments described in the regulations? If so, the claimant is disabled and is entitled to benefits. If the claimant's impairment does not meet or equal one of the impairments listed in the regulations, then the case cannot be resolved at step three, and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(a)(4)(iii).

**Step Four.** Considering the claimant's residual functional capacity, is the claimant able to do any work that he or she has done in the past? If so, then the claimant is not disabled and is not entitled to benefits. If the claimant cannot do any work he or she did in the past, then the case cannot be resolved at step four, and the case proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(a)(4)(iv).

**Step Five.** Considering the claimant's residual functional capacity, age, education, and work experience, is the claimant able to "make an adjustment to other work?" If not, then the claimant is disabled and entitled to benefits. *See* 20 C.F.R. § 404.1520(a)(4)(v). If the claimant is able to do other work, the Commissioner must establish that there are a significant number of jobs in the national economy that the claimant can do. There are two ways for the Commissioner to show other jobs in significant numbers in the national economy: (1) by the testimony of a vocational expert or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R., part 404, subpart P, app. 2. If the Commissioner meets this burden, the claimant is not disabled.

For steps one through four, the burden of proof is on the claimant. At step five, the burden shifts to the Commissioner. *See Tackett*, 180 F.3d at 1098.

## IV. SUMMARY OF RECORD AND ADMINISTRATIVE FINDINGS

This section summarizes (A) the medical evidence in the administrative record, (B) Ms. Hulen's testimony, (C) the vocational expert's testimony, and (D) the ALJ's findings.

### A. Medical Evidence

### 1. March 2005 – November 2005 (Treating Physician Paul Knouf, M.D.)

On March 11, 2005, Dr. Knouf saw Ms. Hulen for low back pain that radiated down one leg or the other about three times daily. AR 412. Ms. Hulen reported significant pain when she power-washed the hog confinements at work. *Id.* Dr. Knouf diagnosed a low back strain and prescribed

UNITED STATES DISTRICT COURT
For the Northern District of California

ibuprofen plus a muscle relaxant before bed.  *Id.*  On March 14, 2005, he referred her for a CT scan after she complained of back pain radiating down both legs.  *Id.*  The CT scan revealed "multi-level degenerative disc disease, greatest at L4-5, with disc bulging in multiple levels, greatest at L4-5." AR 411.  Dr. Knouf restricted lifting to no more than 25 pounds and told Ms. Hulen to stop using the power washer.  *Id.*  On March 21, 2005, Ms. Hulen saw Dr. Knouf for low back pain after she tried to go to work and her supervisor sent her home.  *Id.*  Dr. Knouf kept her out of work for two weeks pending the next appointment.  *Id.*

After her continued reports of significant pain, and following an examination on April 4, 2005, Dr. Knouf continued to prescribe ibuprofen and muscle relaxers.  AR 410.  Ms. Hulen tried walking on a regular basis but needed to stop and rest when the pain got too severe.  *Id.*  The pain primarily radiated down the left leg but occasionally down both, and the pain occurred about "every other day."  *Id.*  Dr. Knouf noted that Ms. Hulen "moves gingerly" and had tenderness in the lumbar spine. *Id.*  He kept her out of work for another two weeks.  *Id.*

After seeing a specialist, Dr. Huy Trinh, through her employer's workers' compensation insurer, Ms. Hulen saw Dr. Knouf on April 15, 2005.  AR 409.  She told him that Dr. Trinh told her to go back to work and try physical therapy again.  *Id.*  Dr. Knouf told Ms. Hulen to talk to her employer about her dissatisfaction with Dr. Trinh.  *Id.*  He also prescribed more muscle relaxers and Tylenol #3 with codeine.  *Id.*  On April 21, 2005, Ms. Hulen reported persistent low back pain.  AR 408.  She claimed that "nothing seems to help."  *Id.*  Dr. Knouf prescribed Vicodin for pain relief.  *Id.*

At her May 23, 2005 appointment, Ms. Hulen told Dr. Knouf that Dr. Trinh believed that her work injury was "superimposed on previous low back problems."  *Id.*  Dr. Trinh ordered an MRI and steroid lumbar epidural injections on May 6, 2005 and kept in place previous work restrictions barring her from lifting, pushing, or pulling over ten pounds and precluding her from performing repetitive bending, twisting, or sitting.  AR 654-55.  Dr. Knouf prescribed Ms. Hulen more Vicodin based on her reports of continued pain in her low back.  AR 408.  Dr. Knouf advised her to speak with a workers' compensation attorney about getting some definitive therapy for her back.  *Id.*

On June 21, 2005, Ms. Hulen had an X-ray of her cervical, thoracic, and lumbar spine.  AR 413-14.  Dr. Sarkis Kaspar diagnosed Ms. Hulen with "moderate to severe degenerative disc disease, C5-

6 and C6-7," "severe degenerative disc disease L4-5," and "mild to moderate degenerative disc disease at L5-S1." AR 413. Dr. Kaspar noted that her cervical spine "reveal[ed] fairly advanced degenerative disc disease for [her] relatively young age of 41 years." *Id.* Ms. Hulen's lumbar spine X-ray indicated "nearly complete obliteration of the disc space and no instability" at L4-5. *Id.* Her thoracic spine appeared normal. AR 414. When Dr. Knouf called Ms. Hulen with these results, she reported continued back pain that worsened when she walked or vacuumed. AR 407. She said that she rarely used the Vicodin because of its side effects and wondered about using the muscle relaxants. *Id.* Dr. Knouf continued her current medications and referred her to the Fort Dodge pain clinic. *Id.*

On July 26, 2005, Ms. Hulen told Dr. Knouf via telephone that her employer fired her after Dr. Kaspar released her to work because she was unable to do her job due to the pain. AR 406. Ms. Hulen did not receive a copy of Dr. Kaspar's release. *Id.*

On August 16, 2005, Ms. Hulen received an epidural flood in her low back and right shoulder but it did not relieve her pain. AR 386-87, 405. She continued to have low back pain that radiated down her legs. *Id.* The pain clinic prescribed her Neurontin, which made her "feel depressed." *Id.* Dr. Knouf noted that she had tenderness in her low back and that she moved "stiffly." *Id.* He instructed her to stay off Neurontin and prescribed Amitriptyline based on the pain clinic's recommendation. *Id.* He directed Ms. Hulen to contact the pain clinic to try another epidural flood. *Id.*

Ms. Hulen reported continued pain on September 6, 2005. *Id.* She could take only half a Vicodin because she got "shaky, and she . . . feels like she is gnawing on her tongue after she takes a whole tablet." *Id.* The Amitriptyline made her feel "hung over the next morning." *Id.* Ms. Hulen continued to have pain in her low back and upper back and hip pain that occasionally radiated down both legs. *Id.* At times, both of her hands felt numb and tingly, and she occasionally dropped things. *Id.* Ms. Hulen stated that she did not want a second epidural because she got extremely anxious with the first one, and it only lasted for three days. *Id.*

On September 7, 2005, Dr. Knouf noted that Ms. Hulen was "ill-appearing" and had tenderness to the touch in her cervical and lumbar spine. AR 404. He instructed her to stop taking the Vicodin

UNITED STATES DISTRICT COURT
For the Northern District of California

1   and instead gave her a prescription for Tylenol #3 with codeine.  *Id.*  Ms. Hulen called Dr. Knouf on

2   September 12, 2005 and told him that she began taking the Vicodin and Tylenol with a full stomach

3   and the adverse symptoms had gone away.  *Id.*  Dr. Knouf prescribed more Vicodin.  *Id.*

4          On November 30, 2005, a workers' compensation independent medical evaluator Keith Riggins,

5   M.D. examined Ms. Hulen.  AR 455-60.  She reported that she began having low back pain after she

6   fell in the shower at work in 2003.  AR 455-56.  The injury was exacerbated when a 400- to 500-

7   pound sow pinned her against the wall when she was loading it into a crate.  AR 455.  She

8   aggravated her back on March 3, 2005, when she was pouring a gallon jug of soap.  AR 456.  Dr.

9   Riggins's report cites a note from Dr. Kaspar dated July 7, 2005 that states "[Ms. Hulen's] lumbar

10  spine is not operative."  AR 457.

11         Ms. Hulen reported "persistent, and essentially constant, low back pain extending into the left

12  buttock and left lower extremity to the level of the foot recurrently with occasional episodes of

13  radiation of pain into the right lower extremity."  AR 458.  Dr. Riggins concluded that Ms. Hulen

14  had "6% impairment of the whole person due to impairment in function of the lumbar spine."  AR

15  459.  He further determined that Ms. Hulen's present condition was related to exacerbation of a pre-

16  existing disease, but that the injury caused permanent partial impairment.  *Id.*  He permanently

17  limited Ms. Hulen to lifting no more than 20 pounds and no more than 10 pounds frequently.  *Id.*

18  Dr. Riggins also limited her lifting to the interval between her knees and shoulders.  *Id.*  Dr. Riggins

19  concluded that Ms. Hulen suffered from "some degree of chronic pain disorder" that was

20  "superimposed on an underlying organic condition."  AR 460.  He doubted that further epidural

21  injections were likely to relieve Ms. Hulen's pain, and he recommended that she see a clinical

22  psychiatrist/psychologist to determine whether such treatment would be beneficial to her.  *Id.*

23         **2.  December 2005 – October 2008 (Treating Physician Linda Iler, M.D.)**

24         From December 2005 to March 2006, Dr. Iler (who is in Dr. Knouf's office, AR 24) treated Ms.

25  Hulen about once a month.  AR 492-94.  By October 2008, she saw her about every four months.

26  AR 547.  The administrative record reflects her treatment of Ms. Iler.  *See, e.g.*, AR 547 (describing

27  physical examination of back and tests to measure deep tendon reflex); 494 (straight leg raising

28  tests); 647 (April 2008 MRI exhibiting degenerative disc disease at L1-2 and L4-5 with "diffuse disc

ORDER (C 10-04663 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1    bulges at these levels"). The following is a more detailed description of Dr. Iler's treatment records

2    and the other medical assessments of Ms. Hulen in this time period.

3        On December 5, 2005, Dr. Iler examined Ms. Hulen and noted that she was in no acute distress

4    though she was a "little uncomfortable after sitting in the office and waiting for about 45 minutes to

5    an hour." AR 494. Ms. Hulen said that she took Vicodin and Flexeril to help manage her pain but

6    that the pain was off and on and "fairly severe" when she didn't take the medication. *Id.* Dr. Iler

7    noticed that Ms. Hulen had "some palpable lumbar spasm" and diagnosed her with "low back pain

8    secondary to degenerative disc disease." *Id.* She prescribed Vicodin with refills for six months and

9    one Flexeril before bed and up to three per day. *Id.*

10       On January 31, 2006, Ms. Hulen returned with persistent back pain. *Id.* She did not feel that she

11   could return to work and felt depressed because of the chronic pain. *Id.* She had a lot of muscle

12   spasms and sometimes had trouble sleeping. *Id.* At times her pain radiated down into her hips,

13   thighs, and down her leg, though she had not recently had any pain that radiated into her leg. *Id.*

14   Ms. Hulen said that she was able to walk short distances but got lower back spasms when she

15   walked for longer distances causing her to have to sit and rest. *Id.* She had applied for disability

16   and felt that there was nothing that anyone could do to alleviate her back pain. *Id.* Dr. Iler

17   concluded that Ms. Hulen had palpable spasms in her lower back and "intrathoracic region," but the

18   straight leg raising was "unremarkable." *Id.* She diagnosed her with myofascial pain and "probably

19   underlying depression" secondary to her degenerative disc disease. AR 493. Dr. Iler prescribed

20   Cymbalta for the depressive symptoms and instructed her to begin a walking routine to build up

21   strength. *Id.*

22       On February 14, 2006, Dr. Iler saw Ms. Hulen, observing that "she does seem to be getting

23   better, but still feels some signs and symptoms of depression." *Id.* Ms. Hulen was considering

24   beginning an exercise routine that included walking. *Id.* She seemed calmer and appeared to be

25   handling some stresses with her daughter and her ex-husband well. *Id.* Dr. Iler diagnosed her with

26   chronic myofascial pain caused by a history of degenerative disc disease and low back comfort and

27   depression. *Id.* She continued to prescribe Cymbalta as it seemed to work fairly well. *Id.*

28       Ms. Hulen's visit with Dr. Iler on March 2, 2006 was "unremarkable." AR 492. Dr. Iler noted

ORDER (C 10-04663 LB)

8

UNITED STATES DISTRICT COURT
For the Northern District of California

1  that Ms. Hulen was responding well to Cymbalta and was in better spirits. *Id.* Ms. Hulen was

2  "getting around better and having less pain in her back, although she still has some pain." *Id.* Dr.

3  Iler prescribed more Cymbalta. *Id.*

4  State agency physician Dr. James Wilson reviewed Ms. Hulen's file on April 14, 2006. AR 503-

5  11. He found that she could occasionally lift up to 20 pounds and frequently lift up to 10 pounds.

6  AR 505. He also determined that she could stand, walk, or sit for about six hours a day in an eight-

7  hour workday with normal breaks. *Id.* Dr. Wilson also stated that Ms. Hulen could occasionally

8  climb, balance, stoop, kneel, crouch, and crawl. AR 506. He noted Dr. Riggins's 6% impairment

9  rating and observed that her gait was "ok" and her strength was "adequate," which "partially

10  erode[d] the credibility of claimaint's statements." AR 509. He noted that the treatment records did

11  not significantly differ from his findings. AR 510.

12  At the request of the Social Security Administration, on June 2, 2006, Theodore Liautaud, D.O.,

13  performed a psychiatric examination of Ms. Hulen. AR 514. Ms. Hulen said that her frustration and

14  depression were caused by chronic back pain that prevented her from working, and she said that

15  improving her pain would alleviate her depression. AR 515. He concluded that she was depressed

16  and had feelings of hopelessness and recommended that a vocational rehabilitation testing and

17  program should be included in any "adaptive functioning" regimen. AR 516.

18  On August 30, 2006, Dr. Iler saw Ms. Hulen. AR 547. A week earlier, she fell from a short

19  stepladder and landed on her back while washing windows. *Id.* This aggravated her back pain. *Id.*

20  Ms. Hulen had stopped taking Cymbalta because "it gave her some side effects that she didn't care

21  for." *Id.* Ms. Hulen did not appear to be in severe discomfort and was able to "get up and move

22  about in the room without any problems." *Id.* Dr. Iler stated, "She was more concerned about

23  getting a letter for her disability than anything else and wanted us to write a letter indicating that she

24  was disabled." *Id.* Dr. Iler advised Ms. Hulen that she needed to go through the "disability routine"

25  and get the proper examinations and documentation. *Id.* Dr. Iler determined that Ms. Hulen had

26  "palpable muscle spasm in the lumbar region on the left side" and that the "straight leg raising was

27  only slightly positive on the left." *Id.* She directed Ms. Hulen to continue her medications. *Id.*

28  At the request of the Social Security Administration, on January 11, 2007, Eugene Glass, Psy.D.,

UNITED STATES DISTRICT COURT
For the Northern District of California

1  performed a psychiatric consultative examination of Ms. Hulen.  AR 378-81.  She arrived at the

2  appointment on time and was adequately dressed and groomed.  AR 379.  She was cooperative

3  throughout the interview but appeared "anxious, irritable, sad, and angry at times."  *Id.*  He

4  concluded that she suffered from an adjustment disorder with depression.  AR 380.  Ms. Hulen said

5  that she wanted to return to work, but Dr. Glass observed that she "appeared resistant and resentful

6  to be in this position in the first place."  *Id.*  He determined that she would have "mild difficulty

7  maintaining attention, concentration, and pace in carrying out instructions in the typical workplace."

8  *Id.*  He also stated that "she would be able to remember and understand instructions, procedures, and

9  locations, and probably would have some difficulty interacting appropriately with supervisors and

10  co-workers at times as she appears to get frustrated/irritable easily.  *Id.*

11        Dr. Iler continued to treat Ms. Hulen until October 2008.  On October 27, 2008, following an

12  October 9, 2008  examination, Dr. Iler completed a "Spinal Impairment Questionnaire," which

13  contains stock questions and essentially is a fill-in-the-blank questionnaire  AR 645-51.  Dr. Iler

14  gave Ms. Hulen a "fair" prognosis and noted a limited range of motion in her lumbar spine and

15  muscle spasms in the same region.  AR 645-46.  Because of her degenerative disc disease at L1-2

16  and L4-5 and corresponding disc bulges at those levels, Ms. Hulen had low back pain with minimal

17  exertion and she could not bend, stoop repeatedly, or do heavy lifting.  AR 647.  Prolonged sitting

18  causes Ms. Hulen to develop pain in her lower back.  *Id.*  Question 10 asked Dr. Iler to estimate Ms.

19  Hulen's residual functional capacity if she was placed in a "normal competitive five day a week

20  work environment on a sustained basis."  AR 648.  Dr. Iler said Ms. Hulen should not "sit

21  continuously in a work setting" and could sit for no more than an hour and stand for no more than an

22  hour (and could return to sitting 15 minutes after standing).  AR 641.  Dr. Iler also said that Ms.

23  Hulen would need unscheduled rest breaks of unknown frequency of 15 minutes.  AR 650.  Ms.

24  Hulen could frequently lift and carry zero to ten pounds, occasionally lift and carry ten to twenty

25  pounds, and never lift or carry more than twenty pounds.  AR 648-49.  Ms. Hulen "periodically"

26  experienced "pain or other symptoms severe enough to interfere with attention and concentration."

27  AR 649.  Her anxiety and depression contributed to her functional limitations.  *Id.*  Ms. Hulen was

28  capable of tolerating low stress at work.  AR 650.  Moreover, though she did not know how often

1    Ms. Hulen would have to take unscheduled breaks throughout an 8-hour workday, the unscheduled

2    breaks would last on average 15 minutes.  *Id.*  While Ms. Hulen could perform a job that required

3    her to keep her neck in a constant position, her symptoms likely would produce "good days" and

4    "bad days" that would force Ms. Hulen to miss an average of three days of work per month.  *Id.*

5    **B. <u>Ms. Hulen's Testimony</u>**

6        Ms. Hulen testified at two hearings before separate ALJs, one in Iowa on November 24, 2008,

7    and the other in California on January 26, 2010.  AR 38, 63.

8        **1. November 24, 2008 Testimony**

9        Ms. Hulen appeared with her then-attorney, Mr. Glazer.  AR 63.  At the time, she was 45.  AR

10   66.  She completed school up to the eleventh grade.  *Id.*  Her two eldest sons paid her mortgage and

11   bills, and she received food stamps from Iowa Human Services in the amount of $300 per month.

12   AR 77.  Her sons live in California.  AR 76.

13       From approximately 1994 or 1995 to March 2005, Ms. Hulen predominantly worked in the

14   livestock breeding industry although she spent about a year in 1998 as a roofer in California.  AR

15   67-68.[4]  At her last job, Ms. Hulen moved the sows around, washed them, "[loaded] them up,"

16   unloaded them, bred them, fed them, and gave them water.  AR 67.  The heaviest weight she lifted

17   was approximately 75 pound buckets of manure.  *Id.*

18       In March 2005, she was "mashed" by a sow, and her doctor originally thought it was a pinched

19   nerve.  *Id.*  Later she was running after a "geld" when "it felt like [her] body was leaving [her] legs."

20   *Id.*  Her doctor then put her on leave until he could determine what was wrong with her back.  *Id.*

21       At the time of the hearing, Ms. Hulen owned a house that she purchased when she was working

22   as a livestock breeder, and she lived there with her then-12-year-old daughter.  AR 68.  The pain and

23   the symptoms in her back were unpredictable.  AR 70-71.  She had good days and bad days, and her

24   daughter frequently had to help her with household chores such as cooking, cleaning, and mowing

25   the lawn.  AR 69.  Ms. Hulen could not push the lawn mower.  *Id.*  Her lower back and sometimes

26

27 _____

28       [4] The transcript indicates that the parties referred to Ms. Hulen's job as breeding "cows."
*See, e.g.,* AR 67.  The records, however, demonstrate that Ms. Hulen worked with "sows," not
"cows."  *See, e.g.,* AR 256-58.  The court presumes this was a typo.

**U<small>NITED</small> S<small>TATES</small> D<small>ISTRICT</small> C<small>OURT</small>**
**For the Northern District of California**

UNITED STATES DISTRICT COURT
For the Northern District of California

1   the middle of her back caused her pain.  *Id.*  She stated, "It feels like there's a little man in here just

2   stretching it."  *Id.*  The pain sometimes extended into her left leg, her right leg, or both legs.  *Id.*  On

3   one occasion, Ms. Hulen tried to take her daughter to Fort Dodge (approximately a thirty-minute

4   drive from her home) but suddenly got a pinched nerve in her back that made her start "jolting" and

5   forced them to return home.  AR 70.  Her daughter played sports but Ms. Hulen sometimes could not

6   attend games because sitting on the metal benches caused too much pain.  AR 77.  Ms. Hulen tried

7   to avoid lifting and limited herself to lifting no more than ten pounds when she had to do so.  AR 71.

8       Some mornings, Ms. Hulen woke up in serious pain.  *Id.*  To alleviate the pain, she put a heating

9   pad on her back and laid on her side with a pillow between her legs, spending a half day in this

10  position.  *Id.*  Some mornings she would wake up "okay" and would begin to vacuum one room but

11  would be unable to finish vacuuming the downstairs.  AR 72.  She estimated that she had about four

12  to five of the "bad days" per week.  *Id.*  On these days she felt like she was "walking on ice" and

13  could walk only from her front room to the kitchen.  *Id.*  She could sustain sitting only for about 30

14  to 45 minutes.  AR 72-73.  Her pain radiated down her legs about three to four times a week.  AR

15  73.  Her medications (Vicodin and muscle relaxers) alleviated the pain only partially, and the muscle

16  relaxers made her tired.  AR 74.  She sometimes napped during the day after "a bad night" the night

17  before.  *Id.*  Her pain caused her to cry two to three times per week.  *Id.*  The epidural injections and

18  physical therapy did not help her.  AR 76.

19      In her free time, Ms. Hulen and her daughter make candles and sew quilts.  AR 77-78.  She

20  occasionally goes shopping at Fort Dodge (30 minutes away) and goes out for dinner about once a

21  month.  AR 79.  Ms. Hulen attends Catholic mass on Sundays.  *Id.*

22      **2.  January 26, 2010 Testimony**

23      In August 2009, Ms. Hulen moved to Oakley, California to live with one of her sons.  AR 54-55.

24  She appeared before an ALJ on January 26, 2010 with her attorney, Richard Hundahl.  AR 38.  The

25  highest grade she completed was eleventh grade.  AR 53.  Her disability report (AR 237-49) reflects

26  one year of college in 1979, but at the hearing, she clarified that she filled out the form online, and

27  her neighbor, Laurie Christiansen, actually typed the answers into the online form.  AR 53.

28      Ms. Hulen testified that she last worked in March 2005 after a sow chased her at work, and she

ORDER (C 10-04663 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1   exacerbated the injury to her back when a sow pinned her against a wall.  AR 41-42.  Ms. Hulen

2   stated, "A sow was chasing me, and I just felt like my body parts were leaving each other."  AR 41.

3   Though she tried, she was unable to return to work.  AR 43.  Consequently, her employer terminated

4   her.  *Id.*  Ms. Hulen settled her workers' compensation case and received about $25,000 and no

5   provisions for future medical care or vocational rehabilitation.  AR 42, 55.  Her attorney received

6   approximately $15,000.  AR 42.

7        After her employer terminated her, Ms. Hulen's doctor instructed her not to look for another job

8   until he completed testing and could determine what was wrong with her back.  AR 43.  She

9   originally took Tylenol to relieve the pain but then began taking Vicodin and muscle relaxers.  AR

10  44.  Since her last injury in March 2005, Ms. Hulen testified that her pain had gotten worse and

11  affected her more frequently.  AR 45.  She also said that the physical therapy sometimes helped and

12  sometimes did not help alleviate her pain.  AR 45.  Ms. Hulen stated that she took two pain pills a

13  day and that she would have to take about three to four in order to fully alleviate her pain.  AR 47.

14       With respect to her depression, Ms. Hulen was on and off various medications because some of

15  them gave her "bad reactions."  AR 46.  They made her feel like a "weak person" so she stopped

16  taking them.  *Id.*  She likes her independence and "controlling her own mind."  AR 47.  Ms. Hulen

17  stated that she has good days and bad days in dealing with her depression.  AR 46.  She is upset

18  because her sons pay her bills, and she cannot do many activities with her daughter.  AR 46-47.

19       On a normal day, Ms. Hulen awakes, starts her daughter's breakfast, and takes her to school,

20  which is about two blocks away.  AR 48.  If she is in a lot of pain, she will get an ice pack and lay

21  on the couch for a few hours with a pillow between her legs.  *Id.*  After that, she does household

22  chores like cleaning the bathroom.  *Id.*  She cannot clean multiple rooms at once because of the pain.

23  *Id.*  Even when she cleans the bathroom, her daughter mops the floors and cleans the bathtub

24  because she has difficulties performing these tasks.  *Id.*  She sometimes takes naps that last an hour

25  during the day in order to "forget about [her] pain."  AR 50-51.  Additionally, while Ms. Hulen

26  prepares her own meals, her daughter helps her about two or three times per week.  AR 49.  When

27  she is cooking, Ms. Hulen uses a stool so that she can periodically sit.  *Id.*  She estimated that she

28  could stand for about 30 to 45 minutes before the pain in her lower back and sometimes in the

ORDER (C 10-04663 LB)

13

1   middle of her back forces her to sit.  AR 49-50.  After dinner, Ms. Hulen tries to help her daughter

2   with her homework.  AR 51. She has difficulty sleeping.  *Id.*  About two to three times a week, the

3   pain in her back wakes her up.  *Id.*  On good days, Ms. Hulen takes walks with her daughter that last

4   about two to three blocks.  *Id.*  She is "lucky" if she has three or four good days in a week.  *Id.*

5   **C. <u>Vocational Expert Testimony</u>**

6        Vocational Expert Jeffrey Malmuth testified at the January 26, 2010 hearing.  With respect to her

7   relevant past employment history, the Dictionary of Occupational Titles categorized Ms. Hulen as a

8   "livestock breeder" or an "animal caretaker" for her work in the livestock industry.  AR 56.  The

9   livestock breeder job has heavy strength requirements and a specific vocational preparation (SVP) of

10  7.  AR 56.  The "animal caretaker" job had medium strength requirements and an SVP of 4.  AR 56-

11  57.  Ms. Hulen briefly held a job as a "fast food worker," which has light strength requirements and

12  an SVP of 2.  AR 57.  She also worked as a "machine presser," which has medium strength

13  requirements and an SVP of 2.  *Id.*  Mr. Malmuth ruled out all of Ms. Hulen's past work history

14  except the "fast food worker" because the jobs had more than light strength requirements.  *Id.*  He

15  then ruled out the "fast food worker" because it did not provide workers with a sit/stand option.  *Id.*

16       Based on Ms. Hulen's age (46 at the time of the hearing), education (eleventh grade),

17  experience, and job restrictions (alternating sitting and standing at will; no ladders, ropes, or

18  scaffolds; occasional crouching, crawling, kneeling, stooping, balancing, and using ramps;

19  occasional use of bilateral foot pedals; and occasional interaction with co-workers and the public),

20  Mr. Malmuth concluded that Ms. Hulen could perform "production type work."  AR 57-59.

21  Specifically, he determined that Ms. Hulen could work as a "power screwdriver operator," which

22  had light strength requirements and an SVP of 2.  AR 59.  There were approximately 91,000 of these

23  jobs available nationally, and 1,700 available regionally.  *Id.*  Ms. Hulen's sit/stand option, however,

24  resulted in an approximately 50% erosion of the available jobs.  *Id.*

25       Mr. Malmuth also concluded that Ms. Hulen could work as a "cleaner," who cleans fabrication

26  or assembly operations.  AR 59-60.  Regionally, there were only 53 jobs while nationally, there were

27  9,300.  AR 60.  Once again, Ms. Hulen's sit/stand option erodes these numbers by about 50%.  *Id.*

28  Mr. Malmuth determined that Ms. Hulen also could become a "light" hand packager.  AR 60-61.

UNITED STATES DISTRICT COURT
For the Northern District of California

There are approximately 2,000 jobs regionally and 200,000 jobs nationally, less the 50% erosion. *Id.*

If Ms. Hulen could not attend work because of back pain at least three times a month and required unscheduled breaks for 15 minutes every hour, then (Mr. Malmuth concluded) there were no jobs available for her, especially at the unskilled level of work.  AR 61.  He stated, "In the unskilled area not more than one to two unscheduled absences a month would preclude an individual from competitive employment, or competitive unskilled employment."  *Id.*  He clarified that more than one unscheduled absence would preclude competitive employment.  AR 62.

**D.  Administrative Findings**

Applying the sequential evaluative process, on March 5, 2010, the ALJ held that Ms. Hulen was not disabled under Section 1614(a)(3)(A) of the Social Security Act and thus was not entitled to supplemental security income.  AR 28.

At step one, the ALJ found that Ms. Hulen had not engaged in substantial gainful activity since March 16, 2005.  AR 19.

At step two, the ALJ found that Ms. Hulen suffered from the following severe impairments: "lumbar degenerative disc disease and adjustment disorder."  *Id.* (finding that impairments had persisted for more than twelve months).  The lumbar disorder was demonstrated by an MRI and results (according to the State agency medical consultants) in a limitation to light work.  AR 19. The adjustment disorder was diagnosed by the consultative consultant and results in some difficulties with interactions with others.  *Id.*

At step three, the ALJ found that Ms. Hulen did not suffer from an impairment or combination of impairments that was either listed in or medically equivalent to one of the listed impairments in the regulations.  *Id.*

The ALJ then determined Ms. Hulen's residual functional capacity in order to assess at steps four and five whether she could perform her past relevant work or any other work considering her age, education, and work experience.  He found that Ms. Hulen had the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except that she was able occasionally to climb stairs and ramps, balance, stoop, kneel, crouch, and crawl, except that she cannot climb

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

ladders, ropes, or scaffolds.  She occasionally can use foot pedals bilaterally.  She requires the

option to alternate between sitting and standing at will throughout the work day.  She is limited to

work activity that requires no more than occasional interaction with co-workers and the public.  AR

21.

In making this finding of residual functional capacity, the ALJ considered the symptoms and

how consistent they were with the objective medical evidence (based on the requirements of 20

C.F.R. § 404.1529 and Social Security Rulings 96-4p and 96-87p).  *Id.*  He also considered opinion

evidence under 20 C.F.R. § 404.1527 and Social Security Rulings 96-2p, 96-5p, 96-6p, and 06-3p.

*Id.*  He followed a two-step process, first determining whether there was a medically-determinable

physical or mental impairment that reasonably could be expected to produce Ms. Hulen's pain and

symptoms, and then evaluating the intensity, persistence, and limiting effects of the symptoms to

determine the extent that they limited Ms. Hulen's ability to do basic work activities.  *Id.*  For the

second part, whenever Ms. Hulen's statements about the intensity or functionally limiting effects of

pain or other symptoms were not substantiated by objective medical evidence, the ALJ made

findings on the credibility of the statements "based on a consideration of the entire record."  *Id.*

The ALJ noted that Ms. Hulen alleged disability based on lumbar degenerative disc disease

following the work injury.  *Id.*  She stated that she had constant back pain (though it lessens

sometimes in intensity), needed pain medications daily, suffered radiating pain down both legs,

cannot lift more than 10 pounds, and was unable to bend, squat, twist, pull, push, sit, stand or walk

for any length of time comfortably.  AR 21-22.  Ms. Hulen said that she can walk only a couple of

blocks before needing rest.  AR 21-22.  She can sit or stand for 30 to 45 minutes but sometimes

cannot stand long enough to shower.  AR 22.  She can get her daughter ready for school, do

household chores, do laundry, prepare meals, and take care of her personal needs, although it takes

longer and she is in constant pain.  AR 21.  She can walk, drive and ride in a car, shop, pay bills,

watch television and movies, play cards, play games with her daughter, and socialize with others

frequently.  *Id.*  She can no longer dance or play sports.  *Id.*  She has no difficulty paying attention,

following instructions, or getting along with authority figures, and she handles stress and changes in

routine "OK."  *Id.*  Her pain worsens with cold wet weather and movement.  AR 22.  She has three

1   or four good days and the same number of bad days in a week. *Id.*

2        Her friend Laurie Christiansen affirmed what Ms. Hulen said. AR 22.  Because Ms.

3   Christiansen's responses were quite similar to Ms. Hulen's own statements and appeared based on

4   them, the ALJ "assign[ed] only limited weight to [Ms. Christiansen's] opinion to the extent it is

5   consistent with the residual functional capacity." *Id.*

6        Ms. Hulen "was treated by Dr. Knouf and Dr. Iler, and with physical therapy, which had mixed

7   results." AR 22.  Her symptoms were worse by the hearing; her pain occurs more often. *Id.*  She

8   tried medication for depression with mixed results and stopped taking it. *Id.*  She moved to

9   California in 2009 to live with her son and daughter-in-law. *Id.*  She had not looked for work

10  because she was waiting for her doctors to release her to return to work. *Id.*

11       After reciting these facts, the ALJ found that Ms. Hulen's "medically determinable impairment

12  could reasonably be expected to cause some alleged symptoms" but found that her "statements

13  concerning the intensity, persistence and limiting effects of these symptoms are not credible to the

14  extent that they are inconsistent with the above residual functional capacity assessment." *Id.*

15       The ALJ then turned to Ms. Hulen's allegations of depressive symptoms.  On June 2, 2006, at

16  the request of the Social Security Administration, Theodore Liautand, D.O., examined her.  AR 22.

17  She reported feeling hopeless and helpless about her financial situation. *Id.*  She denied anger,

18  concentration, or memory problems. *Id.*  Dr. Liautand diagnosed a major depressive disorder and an

19  adjustment disorder. *Id.*  The ALJ noted that his "Global Assessment of Functioning score of 45,

20  which indicates serious symptoms, appears incongruent with his narrative and likely took into

21  consideration all of the factors he listed under Axis III and Axis IV, including financial problems."

22  *Id.* (citing Exh. 14F).  He recommended vocational rehabilitation testing and a program. *Id.*

23       On January 11, 2007, at the request of the Social Security Administration, Eugene Glass, Psy.D.,

24  examined Ms. Hulen.  AR 23.  She alleged trouble sleeping, low energy and motivation,

25  forgetfulness and poor concentration, anger, sadness, and crying spells. *Id.*  Dr. Glass concluded

26  that Ms. Hulen had an adjustment disorder with depressed mood, chronic. *Id.*  He advised Ms.

27  Hulen to pursue an occupation with less exertional effort and noted her failure to follow through on

28  the 2006 recommendation for vocational training. *Id.*  He said that Ms. Hulen would have mild

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

difficulty maintaining attention, concentration, and pace in carrying out instructions in the typical work place. *Id.* She would be able to remember and understand instructions, procedures, and locations and probably would have some difficulty interacting appropriately with supervisors and co-workers at times because "she appears to get frustrated/irritable easily." *Id.* He assessed a Global Assessment of Functioning of 56, which indicates moderate symptoms, and took into account "multiple physical problems" and "financial problems" that Ms. Hulen reported. *Id.*

The ALJ then noted again that Ms. Hulen had voluntarily stopped taking her medications for depression and observed that she did not report any serious symptoms and had sought no treatment or counseling. *Id.* He stated that the "psychological assessments are several years old and it may be that her symptoms have abated somewhat." *Id.* He concluded that there was no basis for any psychologically-based work limitations other than that set forth in the residual functioning capacity, stating "[w]ere her symptoms more serious, I would expect that she would require medication and/or therapy; in the absense of any such ongoing treatment (to which she has access), I conclude that her symptoms are not so serious." *Id.*

Turning to the physical examinations of her spine, the ALJ noted that a June 2005 MRI of her lumbar spine showed severe degenerative disc disease at L4-5 with endplate sclerosis, nearly complete obliteration of the disc, no instability, and no spondylosis or spondylolisthesis. *Id.* There is mild to moderate degenerative disc disease at L5-S1. *Id. (citing* Exh. 4F at 13). A June 2005 MRI of her cervical spine also revealed moderate to severe degenerative disc disease at C5-6 and C6-7, with junctional laxity without true instability at C4-5 and neural foraminal encroachment by osteophytes at the four neural foramina. *Id.* In August 2005, she was treated by Abhay Anand, M.D., who noted Ms. Hulen's complaints of radiating pain down both legs (consistent with her March 2005 complaints) and prescribed an epidural steroid injection and trigger point injections together with Amitriptyline and Neurontin. *Id.*

Paul Knouf, M.D., treated Ms. Hulen from March to October 2005 and treated her with pain medications and ordered the MRI scans. AR 24. He wrote that he believed she was not capable of returning to her past work and specifically stated that he did not have an opinion as to whether she is disabled. *Id.* Kenneth Riggins, M.D., examined Ms. Hulen in November 2005. *Id.* He concluded

1   that she should be limited to lifting 10 pounds frequently and 20 pounds occasionally, with the

2   lifting combined to the area between the shoulders and knees.  *Id.*  He recommended a psychological

3   evaluation for a chronic pain disorder "superimposed on an underlying organic condition."  *Id.*  A

4   May 2005 "fitness for duty" report limited Ms. Hulen to light duty with no lifting, pushing, or

5   pulling over 10 pounds and no repetitive bending, twisting, or squatting.  *Id.* (citing Exh. 35F).  A

6   letter from her employer reflected that she was released for work in July 2005 by Drs. Trinh and

7   Kaspar.  *Id.* (citing Exh. 1E).  The ALJ stated that Dr. Riggins's conclusions were consistent with an

8   ability to perform some work (although not the heavy work of Ms. Hulen's prior job).  *Id.*

9       In December 2005, Linda Iler, M.D. (also in Dr. Knouf's office) began treating Ms. Hulen.  In

10   January 2006, Ms. Hulen reported that she had no radiating pain into her legs, still had some low

11   back pain, and could not walk more than one half mile without feeling pain.  *Id.*  In February 2006,

12   she reported improvement, less depression, better spirts, getting around better, and less pain in her

13   back.  *Id.*  Dr. Iler saw her in August 2006, and Ms. Hulen said that she had aggravated her back

14   pain by falling off a short stepledder.  Dr. Iler saw Ms. Hulen in April and October 2008.  AR 24-25.

15   Dr. Iler offered an opinion about Ms. Hulen's functional capacity in October 2008.  AR 25 (citing

16   Exh. 34F).  According to Dr. Iler, the MRI shows degenerative disc disease at L1-2 and L4-5 with

17   diffuse disc bulges.  *Id.* (no mention of cervical problems or whether MRI showed worsening in

18   condition).  Dr. Iler reported that Ms. Hulen alleged pain in her low back with minimal exertion, an

19   inability to bend or stoop repetitively, and an inability to do heavy lifting.  *Id.*  Dr. Iler concluded

20   that Ms. Hulen could sit for no more than one hour, could stand or walk for no more than one hour

21   in an eight-hour work day, should alternate between standing and sitting about every hour for fifteen

22   minutes, can lift and carry 10 pounds frequently and 20 pounds occasionally, and is likely to be

23   absent more than three times a month due to her symptoms.  *Id.*  She cannot push, pull, bend, or

24   stoop at all.  *Id.*

25       The ALJ found that Dr. Iler's opinion was "internally inconsistent because she reported that Ms.

26   Hulen could work for no more than two hours a day but that she should alternate between sitting and

27   standing every hour and could hold her head in a constant position for a full eight hour workday."

28   AR 25.  This also was inconsistent with Ms. Hulen's statements that she could bend and stoop, but

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  not repetitively, while Dr. Iler precluded that activity altogether.  *Id.*  Additionally, the ALJ found

2  that her conclusions contradicted her earlier statements that Ms. Hulen had "improved

3  considerably," with no radicular symptoms.  *Id.*  The ALJ acknowledged that Ms. Hulen alleged

4  radicular symptoms at the hearing, but "there is no clinical evidence to support worsening

5  symptoms."  *Id.*  The ALJ concluded that in so far as Dr. Iler's opinion differed from his

6  determination about residual functional capacity he previously articulated, her opinion was "without

7  substantial support from the other evidence of record, including Dr. Iler's own clinical records."  *Id.*

8  He "accord[ed] it only limited weight in [his] decision."  *Id.*  He "accord[ed] greater weight to the

9  State agency medical consultants because they are familiar with the requirements of the Social

10  Security program, and their opinions are consistent with the substantial objective evidence in the

11  record."  *Id.*

12       The ALJ then discounted Ms. Hulen's testimony to the extent that it differed from the

13  established residual functional capacity, stating that she "alleges pain and dysfunction in excess of a

14  level consistent with the objective and clinical findings."  AR 25-26.  First, he concluded that Ms.

15  Hulen was able to handle her daily activities (including household chores and caring for her

16  daughter), albeit at a slower pace.  AR 26.  She also was able to socialize, play cards, and watch

17  television and movies.  *Id.*  The ALJ next observed that Ms. Hulen reported "substantial

18  improvement in her pain symptoms" in 2006 and 2007 and now takes only two pills a day for pain

19  because more makes her drowsy.  *Id.*  Nothing in the record shows that she was advised to consider

20  surgery.  *Id.*  Her solid work history bolstered her credibility, but her employer reported that she was

21  medically cleared to return to work in July 2005.  *Id.*  He discounted her testimony that she never

22  sought work at a lower level of exertion because she was waiting for clearance from her doctors,

23  stating that this response  was "vague and did not account for the clearance to work reported by the

24  employer."  *Id.*  Finally, her testimony at the 2010 hearing was inconsistent with her earlier reports

25  to her doctors in 2006 and 2007 that she had improved.  *Id.*  It also was inconsistent with Dr.

26  Riggins's assessment.  *Id.*  The ALJ concluded that there was "no objective evidence demonstrating

27  worsening of Claimant's condition to substantiate her claims of now debilitating pain."  *Id.*  To the

28  extent that Ms. Hulen alleged pain to such a degree that she was limited to more than the ALJ's

1  determination about residual functional capacity, the ALJ did not find her credible. *Id.* The ALJ

2  concluded that Ms. Hulen did not prove that her residual functional capacity was more restrictive

3  than the one he set forth. *Id.*

4     Having determined Ms. Hulen's residual functional capacity, the ALJ proceeded with steps four

5  and five of the sequential evaluative process.

6     At step four, the ALJ accepted the testimony of vocational expert Jeffrey Malmuth and

7  concluded that Ms. Hulen was unable to perform past relevant work. AR 26.

8     Proceeding to step five, the ALJ acknowledged that the Social Security Administration was

9  responsible for providing evidence that demonstrates that other work exists in significant numbers in

10  the national economy that Ms. Hulen could do, given the residual functional capacity, age,

11  education, and work experience. AR 19. The ALJ noted that Mr. Malmuth testified that given all

12  the factors, Ms. Hulen would be able to perform the requirements of representative occupations such

13  as power screwdriver operator (91,000 jobs nationally, 1,700 regionally, and a 50 percent erosion

14  because of the sit/stand option), cleaner, fabrication, or assembly operation (9,300 jobs nationally,

15  53 regionally, 50 percent erosion), or hand packager (200,000 nationally, 2,000 regionally, 50

16  percent erosion). He acknowledged that the vocational expert testified that if an individual had more

17  than one unscheduled absence per month, competitive unskilled work would be precluded. AR 28.

18  The ALJ concluded that there were significant jobs that existed in the national economy that Ms.

19  Hulen could perform and made a finding of "not disabled." AR 27-28.

## V. DISCUSSION

21     Ms. Hulen challenges the ALJ's decision on three grounds: (A) the ALJ erred by rejecting

22  treating physician Linda Iler's opinion; (B) the ALJ erred by discrediting Ms. Hulen's testimony

23  about the severity and frequency of her pain; and (C) the ALJ erred by finding that significant jobs

24  existed in the national economy that Ms. Hulen could perform. Plaintiff's Motion, ECF No. 16 at 9-

25  10.

### A. **Treating Physician**

27     Ms. Hulen challenges the ALJ's rejection of treating physician Linda Iler's opinion that she was

28  likely to be absent from work at least three times a month because of her impairments or treatments

UNITED STATES DISTRICT COURT
For the Northern District of California

1   for them.  AR 650.  Ms. Hulen points out that no evidence in the record contradicts this opinion, and

2   her own testimony was that she has several bad days a week.  Motion, ECF No. 16 at 13.  Dr. Iler's

3   opinion is important because the vocational expert identified three jobs (power screwdriver operator,

4   fabrication cleaner, and hand packager) based on the ALJ's hypothetical identifying the job

5   limitations (such as light work, only occasional crouching or use of stairs, and the option to sit or

6   stand at will).  AR 21.  When the hypothetical was expanded to include absenteeism of more than

7   one unscheduled absence from work per month, the expert testified that competitive unskilled work

8   would be precluded entirely.  AR 28.  Put more succinctly, if one accepts Dr. Iler's opinion, then

9   there are no jobs for Ms. Hulen in the national economy.  Ms. Hulen argues that the ALJ erred by

10  rejecting that opinion without providing specific and legitimate reasons supported by substantial

11  evidence for rejecting them.  The court agrees.

12        When determining whether a claimant is disabled, the ALJ must consider each medical opinion

13  in the record together with the rest of the relevant evidence.  20 C.F.R. § 416.927(b); *Zamora v.*

14  *Astrue*, No. C 09-3273 JF, 2010 WL 3814179, at *3 (N.D. Cal. Sept. 27, 2010).  "Opinions of

15  examining physicians are afforded more weight than those of non-examining physicians, and the

16  opinions of examining non-treating physicians are afforded less weight than those of treating

17  physicians."  *Orn v. Astrue*, 495 F.3d 625, 631 (9th Cir. 2007) (citing 20 C.F.R. § 416.927(d)(1)-(2));

18  *see also* 20 C.F.R. § 404.1527(d).  A treating physician's opinion is accorded controlling weight if it

19  is supported by "medically acceptable diagnostic techniques and is not inconsistent with other

20  substantial evidence in the record."  *See Holohan v. Massanari*, 246 F.3d 1195, 1202 (9th Cir. 2001).

21  It is not entitled to controlling weight, however, where substantial evidence in the record contradicts

22  the opinion.  *See Orn*, 495 F.3d at 632 (citing 20 C.F.R. § 404.1527(d)(2)).  Nonetheless, even if the

23  treating physician's opinions are not entitled to controlling weight, they are still entitled to

24  deference.  *Id.*

25        Similarly, to reject the uncontradicted opinion of a treating or examining physician, the ALJ

26  must provide "clear and convincing reasons that are supported by substantial evidence."  *Ryan v.*

27  *Commissioner*, 528 F.3d 1194, 1198 (9th Cir. 2008).  Even if a treating or examining doctor's

28  opinion is contradicted, the ALJ may not reject the opinion without providing "specific and

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1  legitimate reasons supported by substantial evidence." *Id.* Opinions of non-examining doctors

2  alone cannot provide substantial evidence to justify rejecting either a treating or examining

3  physician's opinion. *See Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 602 (9th Cir. 1999).

4  An ALJ may rely partially on the statements of non-examining doctors to the extent that independent

5  evidence in the record supports those statements. *Id.* Moreover, the "weight afforded a

6  non-examining physician's testimony depends 'on the degree to which they provide supporting

7  explanations for their opinions.'" *See Ryan*, 528 F.3d at 1201 (quoting 20 C.F.R. § 404.1527(d)(3)).

8      Here, Dr. Iler's opinion about absenteeism was uncontradicted. The ALJ, however, discounted

9  her opinion to the extent that it was inconsistent with the ALJ's determination of residual functional

10  capacity. That determination limited residual functional capacity to light work, only occasional

11  crouching, crawling, kneeling, stooping, balancing, or the use of ramps or stairs, and only occasional

12  use of bilateral foot pedals or interaction with co-workers and the public. AR 21. The ALJ also

13  limited the job to those that would give Ms. Hulen the option to stand or sit at will. *Id.* According

14  to the ALJ, Dr. Iler's opinions were inconsistent with the ALJ's determination of residual functional

15  capacity in three ways: (1) Dr. Iler stated that Ms. Hulen could work for no more than two hours a

16  day and should alternate between sitting and standing every hour; (2) Dr. Iler precluded bending and

17  stooping entirely; and (3) Dr. Iler's conclusions were inconsistent with evidence that Ms. Hulen had

18  improved. As a result, the ALJ rejected Dr. Iler's answers (including apparently her uncontradicted

19  answer about absenteeism three times a month), stating that he accorded her opinions "only limited

20  weight" and "accorded greater weight" to the State agency medical consultants because they were

21  familiar with Social Security requirements, and their opinions were "consistent with the substantial

22  objective evidence in the record." *Id.* Because the ALJ implicitly rejected Dr. Iler's opinion about

23  absenteeism as part of his rejection of her opinion testimony generally, the court addresses the ALJ's

24  specific rejections and then turns back to the opinion evidence about absenteeism.

25  **1. Sit/Stand Restrictions**

26      In rejecting Dr. Iler's work restriction to two hours per day and sit/stand alterations every hour

27  the ALJ noted that it was inconsistent with Ms. Hulen's testimony that she could bend and stoop.

28  AR 21. Also, it was inconsistent with Dr. Iler's earlier records that Ms. Hulen had "improved

ORDER (C 10-04663 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  considerably" with no radicular symptoms.  *Id.*  The ALJ acknowledged that Ms. Hulen alleged

2  radicular symptoms at the hearing but concluded that there was "no clinical evidence to support

3  worsening symptoms."  *Id.*

4      First, it is not apparent that there is an internal inconsistency in Dr. Iler's opinions.  As Ms.

5  Hulen points out, the opinion was a response to a series of questions on a spinal impairment

6  questionnaire.  AR 638-43; Plaintiff's Motion, ECF No. 16 at 15.  Dr. Iler said that Ms. Hulen could

7  not stand or sit for more than one hour in an eight-hour, competitive five-day-a-week work

8  environment on a sustained basis.  AR 641.  More specifically, she said that Ms. Hulen should not

9  "sit continuously in a work setting," could sit for no more than an hour and stand for no more than

10  an hour (and could return to sitting 15 minutes after standing).  AR 641.  Dr. Iler also said that Ms.

11  Hulen would need unscheduled rest breaks of unknown frequency of 15 minutes.  AR 650.  Read all

12  together (and considering that these are fill-in-the-blank answers to stock questions on the spinal

13  impairment questionnaire), these opinions are not inconsistent but rather are consistent with Dr.

14  Iler's assessment of Ms. Hulen's condition over the course of several years.  Moreover, Dr. Iler's

15  assessments are consistent with the entire evidentiary record, which – as described supra at pages 4

16  through 10 and summarized infra in section 4 – shows that Ms. Hulen had persistent low back pain.

17      Second, in concluding that the sit/stand opinion was inconsistent, the ALJ apparently found that

18  it contradicted Dr. Iler's opinion that Ms. Hulen could hold her head in a consistent position for a

19  full eight-hour day.  AR 25.  The actual question on the questionnaire was, "Does your patient's

20  condition interfere with the ability to keep the neck in a constant position?", and Dr. Iler answered,

21  "no."  AR 650.  It is unclear why the ALJ viewed this as a reason for discounting Dr. Iler's opinion.

22  In any event, it is not inconsistent with Dr. Iler's other answers or the other evidence in the record.

23      **2. Bending and Stooping**

24      The ALJ also discounted Dr. Iler's restrictions (in her answer on the spinal functioning

25  questionnaire) on bending and stooping, contrasting it with Ms. Hulen's testimony that she could

26  bend and stoop (although not repetitively).  AR 25.  But Dr. Iler prohibited pushing, pulling,

27  bending, and stooping on a "sustained basis," not altogether.  AR 651.  Indeed, State agency

28  physician Dr. James Wilson reviewed Ms. Hulen's file and similarly found that Ms. Hulen could

1   push, pull, bend, or stoop only occasionally.  AR 506.  Dr. Riggins, who performed the workers'

2   compensation independent medical examination, similarly found chronic lower back pain stemming

3   from degenerative disc disease and found that Ms. Hulen could climb, blance, stoop, kneel, crouch

4   or crawl only occasionally.  AR 459, 654.  Dr. Iler's opinions are not inconsistent, either internally

5   or in the context of the entire record.

6   **3.  Worsening of Ms. Hulen's Symptoms**

7   The ALJ also discounted Dr. Iler's overall assessment in the questionnaire as inconsistent with

8   her earlier reports that Ms. Hulen had "improved considerably," with no radicular symptoms.  AR

9   25.  The ALJ acknowledged that Ms. Hulen alleged radicular symptoms at the hearing but concluded

10  that there was "no clinical evidence to support worsening symptoms."  *Id.*  Dr. Iler's records reflect

11  some improvement in 2006 and 2008.  AR 492-93; *see supra* pages 4 to 11 (discussing treatment

12  from 2005 to 2008).  The treatment records also show a fall in August 2006 that aggravated the back

13  pain.  AR 547.  The treatment records about symptoms are consistent with the answers in the

14  questionnaire.  AR 547, 645-51.  And Dr. Iler noted that Ms. Hulen has "good days" and "bad days,"

15  which is consistent with the record as a whole, her previous treatment records, and Ms. Hulen's

16  testimony.  AR 69 and 50.  The record as a whole shows that Ms. Hulen had persistent low back

17  pain.  For example, examining physician Kenneth Riggins, who performed the workers'

18  compensation examination for Ms. Hulen's employer in November 2005, reported that Ms. Hulen

19  presented with "persistent, and essentially constant, low back pain" that sometimes radiated into her

20  lower extremities.  AR 458.  Ms. Hulen's first treating physician, Dr. Knouf, also found chronic low

21  back pain that got worse with activities like walking or vacuuming.  AR 404-12.  Having good days

22  and bad days (with some improvement in pain) is not inconsistent with persistent back pain and Dr.

23  Iler's answers in the spinal assessment questionnaire.

24  **4.  ALJ's Rejection of Dr. Iler's Opinions Not Supported; Effect of Absenteeism**

25  In sum, a full reading of the record does not establish that Dr. Iler's opinions contradict her own

26  treatment records or the evidence in the record as a whole.  Indeed, her opinions in the spinal

27  functioning questionnaire are consistent with her treatment of Ms. Hulen, which included examining

28  her about once a month from December 2005 to March 2006 and about every four months (as of

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

October 2008). AR 492-94, 547; *see supra* at 4 through 11 (describing Dr. Knouf's and Dr. Iler's treatment of Ms. Hulen from March 2005 to October 2008 that culminated in Dr. Iler's opinions on the spinal assessment questionnaire that the ALJ rejected). Dr. Iler's opinions as the treating physician were based on "medically acceptable diagnostic techniques" and are "not inconsistent with other substantial evidence in the record," which means that the ALJ should have accorded them "controlling weight." *See Holohan*, 246 F.3d at 1202 (citing 20 C.F.R. § 404.1527(d)(2)). Instead, he rejected them outright, according them only "limited weight" and "according greater weight to the State agency medical consultants because they are familiar with the Social Security program." AR 25.

More specifically, Dr. Iler's opinions are consistent with her own treatment records and with the prior treating physician's records. *Compare* AR 647-50 (summarized in last section and supra on pages 4 to 11 *with* AR 402-11 (Dr. Knouf's prior treatment of Ms. Hulen's persistent lower back pain). They also are consistent with examinations by Dr. Trinh (the workers' compensation physician) and Dr. Riggins (the workers' compensation independent medical examiner) and the review by Dr. Wilson, the state agency reviewing physician. AR 455-60, 506, 654. As discussed in the next section, the opinions were consistent with Ms. Hulen's testimony. Finally, other medical reports support Dr. Iler's conclusion. *See* AR 413 (June 21, 2005 X-ray revealed "fairly advanced degenerative disc disease for the patient's relatively young age of 41 years" in cervical spine; showed "severe degenerative disc disease [at] L4-5 without instability," "nearly complete obliteration of the disc space" at that level, and "mild to moderate degenerative disc disease at L5-S1"); AR 411 (CT scan revealed "multi-level degenerative disc disease, greatest at L4-5, with disc bulging in multiple levels, greatest at L4-5 with lateralizing left of this level"); AR 647 (April 8, 2008 MRI also showed "degenerative disc disease at L1-2 and L4-5 with diffuse disc bulges at these levels").

To the extent that the treating physician's answers to the stock questionnaire provided more information than the answers of the non-treating examining physicians and the reviewing physician, the ALJ ignored them. Even if they conflicted (and the court cannot see how they do), the ALJ should not have given greater weight to the non-treating examining physicians or the non-examining

**UNITED STATES DISTRICT COURT**
**For the Northern District of California**

1   physician.  *See Orn*, 495 F.3d at 631 (citing 20 C.F.R. § 416.927(d)(1)-(2)); *Holohan*, 246 F.3d at

2   1202; 20 C.F.R. § 404.1527(d).

3       Like the other opinions that the ALJ rejected explicitly, the ALJ ignored or discounted Dr. Iler's

4   opinion that Ms. Hulen was likely to be absent from work at least three times a month.  The effect of

5   this was that the ALJ gave greater weight to the other physicians' omission of this information.  The

6   ALJ should not have ignored the treating doctor's opinion.  *See Orn*, 495 F.3d at 631.  This opinion

7   is dispositive of Ms. Hulen's disability claim because the vocational expert testified that absenteeism

8   of more than one unscheduled absence from work per month would preclude work entirely.  AR 28.

9   **B.  Plaintiff's Subjective Pain and Symptom Testimony**

10      The ALJ found that Ms. Hulen's impairments could cause some of her symptoms, but he found

11  that her statements about the "intensity, persistence, and limiting effect of her symptoms" were not

12  credible to the extent that they were inconsistent with the ALJ's determination of residual functional

13  capacity.  AR 22.  He acknowledged that her self-reports were consistent with her friend Laurie

14  Christiansen's confirmation of the extent of her daily activities, but he discounted Ms. Christiansen's

15  corroboration, characterizing them as "based on" Ms. Hulen's own assessment.  *Id.*  As discussed in

16  the last section, Dr. Iler's testimony about absenteeism establishes that Ms. Hulen is disabled.  The

17  court still addresses briefly the ALJ's rejection of Ms. Hulen's reporting of her symptoms and

18  impairments because that rejection is part of the ALJ's rejection of all information inconsistent with

19  his determination about residual functional capacity.

20      To determine whether a claimant's testimony about subjective pain or symptoms is credible, the

21  ALJ must engage in a two-step analysis.  *See Vasquez*, 572 F.3d at 591 (citing *Lingenfelter v.

22  Astrue*, 504 F.3d 1028, 1035-36 (9th Cir. 2007)).  First, the ALJ must determine whether the claimant

23  has presented objective medical evidence of an underlying impairment that reasonably could be

24  expected to produce the alleged pain or other symptoms.  *See Lingenfelter*, 504 F.3d at 1036.

25  Second, if the claimant meets the first test and there is no evidence of malingering, the ALJ can

26  reject the claimant's testimony about the severity of his symptoms only by offering specific, clear,

27  and convincing reasons for doing so.  *Id.*  When the ALJ finds a claimant's testimony not reliable,

28  the ALJ must "specifically identify what testimony is credible and what testimony undermines the

UNITED STATES DISTRICT COURT
For the Northern District of California

1    claimant's complaints." *Morgan*, 169 F.3d at 499.  This court defers to the ALJ's credibility

2    determination if it is supported by substantial evidence in the record.  *See Thomas*, 278 F.3d at 959.

3        The ALJ identified several reasons for finding Ms. Hulen's testimony not credible.

4        First, he noted that she had stopped taking her antidepressant medication and that "the

5    psychological assessments are several years old and it may be that her symptoms have abated

6    somewhat." AR 23.  He noted that serious symptoms would have required more medication and/or

7    therapy, and he concluded that "in the absence of such ongoing treatment (to which she has access) I

8    conclude that her symptoms are not so serious." *Id.*   But the record here shows that Ms. Hulen

9    stopped taking medication because of the negative side effects, and she said that she did not have

10   access to other mental health services. AR 23, 26, 47, 304 (no insurance; could not afford

11   psychological treatment), 378 (told Dr. Glass that she did not have health insurance), 547.

12       Second, the ALJ pointed to Ms. Hulen's ability to conduct daily activities (getting her daughter

13   ready for school, laundry, meals, personal needs, walking, driving, shopping, playing cards,

14   watching movies) as evidence that she exaggerated her symptoms.  AR 26.  But Ms. Hulen never

15   denied her ability to conduct these activities and said only that she did some things more slowly or

16   could not clean multiple rooms at once.  AR 48-51.  The court observes that her self-reported

17   activities are consistent with Dr. Iler's conclusions (among others) that Ms. Hulen has pain in her

18   lower back following minimal exertion (AR 647), she cannot sit or stand continuously in a work

19   setting (AR 648), and her condition results in good days and bad days (AR 650).

20       Third, the ALJ also concluded that Ms. Hulen exaggerated her symptoms because she reported

21   improvement in her pain symptoms in 2006 and 2007.  AR 22.  But Ms. Hulen's reporting of her

22   symptoms is consistent with Dr. Iler's treatment of her and assessment of her condition.  *See supra*

23   in section 3 on page 25.   It also is consistent with evidence in the record showing persistent lower

24   back impairment. *See id.*

25       Fourth, the ALJ acknowledged that Ms. Hulen's "solid work history" bolstered her credibility,

26   but he discredited her account of her symptoms because her employer reported that – despite her

27   medical clearance to return to work in July 2005 – she did not seek work at a lower exertional level

28   based on her waiting for clearance from her doctors.  AR 26.  The ALJ found this vague.  *Id.*  A few

ORDER (C 10-04663 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  points from the record are worth noting here.  The workers' compensation doctors' releases of Ms.

2  Hulen to return to work are not in the file, and Ms. Hulen said she never received a copy of the

3  release.  AR 406.  The reports that are in the record do not release her to work.  AR 654 and 657

4  (two May 2005 reports from Dr. Trinh; recommends MRI; not ready for work; unable to estimate a

5  date to return to work); AR 411 (Dr. Knouf instructs her not to return to work in March 2005); AR

6  413-14 (June 2005 report from Dr. Kaspar).  Assuming the workers' compensation doctors released

7  her to work by July 2005 (as the employer's letter said), by July 26, 2005, Ms. Hulen told her

8  treating doctor (Dr. Knouf) that she was unable to do her job because of the pain (and thus lost her

9  job).  AR 407.  The administrative record as a whole also shows that Ms. Hulen's accounting of her

10  condition has been consistent not only in treatment but also in her testimony.  And her medical

11  records confirm her severe degenerative disease in her lower back.  Also, at step four, the ALJ found

12  that Ms. Hulen was unable to return to her prior work.  AR 27; *see* AR 236, 657.

13      In sum, the ALJ's discounting of Ms. Hulen's  reports of her condition (and his rejection of the

14  treating doctor's assessment) are inconsistent with the generally-consistent narrative in the entire

15  record of Ms. Hulen's condition.  The court does not find substantial evidence in the record to justify

16  the ALJ's credibility determinations.  *See Thomas*, 278 F.3d at 959.

17  **C.  Vocational Expert Testimony Regarding Jobs In the National Economy**

18      Plaintiff challenges the ALJ's reliance on the vocational expert's testimony that Ms. Hulen could

19  perform other work in the national and local economies.  Plaintiff's Motion, ECF No. 16, at 10-13.

20      At step five, if (considering residual functional capacity, age, education, and work experience)

21  the claimant is able to do other work, the Commissioner must establish that there are a significant

22  number of jobs in the national economy that the claimant can do.  20 C.F.R. § 404.1520(a)(4)(v).

23  The Commission may sustain its burden at step five by posing hypothetical questions to a vocational

24  expert that are based on a claimant's residual functional capacity.  The vocational expert may give

25  evidence about jobs that a hypothetical employee with the same residual functional capacity as the

26  claimant would be able to perform.  *See* 20 C.F.R. § 404.1520(g).  A vocational expert's recognized

27  expertise provides the necessary foundation for his or her testimony, and no additional foundation is

28  required.  *See Bayliss v. Barnhart*, 427 F.3d 1211, 1217-18 (9th Cir. 2005).  The hypothetical

UNITED STATES DISTRICT COURT
For the Northern District of California

1   questions must be based on a residual functional capacity for which there exists substantial support

2   in the record.  *See Magallanes v. Bowen*, 881 F.2d 747, 756-57 (9th Cir. 1989).

3       Here, the hypothetical posed by the ALJ limited the job to light work, only occasional crouching,

4   crawling, kneeling, stooping, balancing, or the use of ramps or stairs, and only occasional foot

5   pedals or interaction with co-workers and the public.  AR 21.  The ALJ also limited the job to those

6   that would give Ms. Hulen the option to stand or sit at will.  *Id.*  The vocational expert identified

7   three jobs: power screwdriver operator, fabrication cleaner, and hand packager.  AR 27-28.  The

8   number of jobs (set forth supra on page 14) were eroded "by approximately 50 percent" based on the

9   need for the sit/stand option.  AR 59.  Plaintiff points out that the record does not reflect, nor did the

10  ALJ clarify, the basis for this 50% erosion assumption.  Plaintiff's Motion, ECF No. 16 at 18.

11      Plaintiff also points out that the kinds of unskilled jobs identified here demand that a worker be

12  in a certain place or posture for a certain length of time to accomplish a certain task.  Motion, ECF

13  No. 16 at 11-12 (citing Social Security Ruling 83-12 and the descriptions of the jobs in the

14  Dictionary of Occupational Titles (DOT)).  Plaintiff points out other problems: the uncertainty about

15  whether the power screwdriver job allowed the machine to move to accommodate sitting or

16  standing; the uncertainty about the limitation about use of a foot pedal on that job; the discrepancy in

17  the descriptions of the job of cleaner (fabrication) in the DOT versus in the vocational expert's

18  testimony; and the uncertainty (in light of the DOT definition) that light work was available for hand

19  packagers.  *Id.* at 11-13.  Given these conflicts, Plaintiff asserts, the Social Security Administration

20  did not meet its burden of producing convincing evidence to justify the ALJ's conclusions at step

21  five.  *Id.* at 13.

22      Regardless of whether these are fair points as to whether the Commissioner met his burden to

23  show a significant number of jobs in the national economy that the claimant can do, the dispositive

24  point is that when absenteeism was added to the hypothetical (here more than one unscheduled

25  absence a month), the expert testified that competitive unskilled work would be precluded entirely.

26  AR 28.  And Dr. Iler's uncontradicted evaluation was that Ms. Hulen would miss an average of three

27  days of work per month.  AR 650.  As the court concluded supra in section V. A., the ALJ's

28  rejection of Dr. Iler's opinion is not supported by substantial evidence in the record.

ORDER (C 10-04663 LB)

UNITED STATES DISTRICT COURT
For the Northern District of California

1  In sum, the Commissioner failed to meet its burden to show alternative work exists that Ms.

2  Hulen can perform.  Under step five, Ms. Hulen is "disabled."

3  **4.  Remand for an Award of Benefits**

4  There are no outstanding issues to be resolved before a disability determination.  The court

5  therefore remands the case for an award of benefits to Ms. Hulen.  *See Varney v. Sec'y of Health and*

6  *Human Services*, 859 F.2d 1396, 1401 (9th Cir. 1988).

7  **VI.  CONCLUSION**

8  The court **GRANTS** Ms. Hulen's motion for summary judgment, **DENIES** the Commissioner's

9  cross-motion for summary judgment, and **REMANDS** the case for an award of benefits consistent

10  with this order.  This disposes of ECF Nos. 16 & 17.

11  **IT IS SO ORDERED.**

12  Dated: September 1, 2011

13  _____
LAUREL BEELER
United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER (C 10-04663 LB)